ELSIE ELMHORST *v.* PRUDENTIAL
INSURANCE COMPANY OF AMERICA.

No. 4334.

OCTOBER 2, 1964.

TSUKIYAMA, C.J., CASSIDY, WIRTZ,
LEWIS AND MIZUHA, JJ.

OPINION OF THE COURT BY LEWIS, J.

Plaintiff-appellant, the widow of Ernest Elmhorst, a retired employee of Gaspro, Ltd., brought this action as the named beneficiary of his life insurance under the provisions of a group policy issued by defendant-appellee, hereinafter referred to as "Prudential." The question at issue was whether the group policy continued to cover Elmhorst up to the date of his death, October 25, 1958. Verdict was directed for Prudential.

The policy was issued effective February 21, 1938, and amended in its entirety effective February 28, 1957. It named as the policyholder Gaspro, Ltd., Elmhorst's employer, hereinafter sometimes referred to as "Gaspro."

We have in the record only the amended policy which provides in pertinent part:

### "PLAN OF INSURANCE

"The classes of Employees eligible for insurance under this Rider comprise all Employees of the Policyholder.

"Each present and future full-time Employee of the eligible classes shall be eligible, as set forth below, to participate in the insurance * * *.

"A full-time Employee means an Employee who works at least the number of hours in the normal work week established by the Policyholder, but in no event shall an Employee be considered a full-time Employee if he works for the Policyholder less than thirty hours per week.

\*　　　\*　　　\*　　　\*　　　\*

"Should an Employee's insurance be continued during disability, leave of absence, temporary lay-off, or retirement, the amount of his insurance shall be the amount for which he was insured on his last day of active work unless otherwise stated above.

\*　　　\*　　　\*　　　\*　　　\*

### "TERMINATION OF INDIVIDUAL INSURANCE

"An Employee's insurance under this Rider shall automatically terminate if his employment terminates as defined below, or if he ceases to be a member of the classes of Employees eligible for the insurance under this Rider, or if this Rider terminates or if he fails to make, when due, any required contribution.

"Termination of employment shall, for all purposes of this Rider, be deemed to occur when an Employee ceases to be actively engaged in work on a full-time basis with the Policyholder. However, an Employee who is disabled, granted a leave of absence, temporarily

laid off, placed on a part-time employment basis or retired will nevertheless be considered as still employed on a full-time basis until the Policyholder, acting on a basis precluding individual selection, terminates the Employee's insurance by notifying the Insurance Company to that effect or by discontinuing premium payments for his insurance, but in no event shall the insurance on any such Employee be continued beyond any limit specified below.

| Reason for cession of work on a full-time basis | Limit referred to above |
| --- | --- |
| Leave of absence or temporary lay-off | End of policy month following policy month during which leave or lay-off commences." |

Other provisions of the policy, serving as background for the question at issue, are set out in a footnote.[1]

Effective February 28, 1957, Prudential issued to Elmhorst its Certificate No. 44 under the group policy, as provided by R.L.H. 1955, § 181-577, as renumbered by S.L. 1957, c. 310. This certificate stated: "All benefits are

---

[1]       "CONVERSION PRIVILEGE

"If an Employee's insurance under this Rider ceases by reason of termination of employment or of membership in the classes eligible for insurance under this Rider, the Employee shall be entitled to convert all or part of his insurance hereunder, without evidence of insurability, to an individual policy of life insurance, provided written application and the first premium payment are made to the Insurance Company within thirty-one days from the date of such termination. * * *

"INSURANCE PROTECTION DURING CONVERSION PERIOD

"If an Employee is entitled by the terms of this Rider to convert all or part of his insurance hereunder to an individual policy but dies within the thirty-one day period following termination of insurance during which application for the individual policy may be made, the amount of insurance which might otherwise have been converted will be paid as a claim under this Rider whether or not application for conversion has been made."

subject in every respect to the Group Policy or Policies, which alone constitute the agreements under which payments are made."

Due to sickness, September 3, 1957 was Elmhorst's last day of work. He then went on sick leave, receiving sick pay to and including December 6, 1957. Deductions of employee contributions were continued out of Elmhorst's sick pay. The last deduction was made December 6, 1957, being one month's payment in advance. That Elmhorst was insured under the policy through 1957 and for some part of 1958 is undisputed.

The amount of the payroll deduction from each employee was thirty-five cents per month per $1,000 of insurance. No contributions were made by Elmhorst after the last deduction from his pay on December 6, 1957. The policyholder had no method of collecting employee contributions other than by payroll deductions.

Annually, at the beginning of the policy year, the policyholder paid an advance premium subject to an adjustment at the end of the year. The adjustment was calculated by Prudential, as was the advance premium, based on information furnished to Prudential by the policyholder from time to time. When an employee was admitted to the plan an enrollment card was filled in and sent to Prudential.[2] As each termination of employment occurred, a form called "Notice of Group Insurance Changes" was supposed to be sent in.

It was Prudential's practice to prepare and keep cur-

---

[2] However, the policy provided:

"EMPLOYEES INSURED

\*      \*      \*      \*      \*

"If an Employee has made written request to the policyholder, on a form approved by the Insurance Company, to participate in the insurance under this Rider and has made the required contributions, the Employee's insurance shall not be invalidated by failure of the Policyholder, due to clerical error, to record or report such Employee for insurance."

rent Group Insurance Rosters of insured employees from the information furnished by the policyholder. These rosters were used to calculate the advance premiums and the adjustments. Due to an error of the policyholder hereafter noted in more detail, Elmhorst's name was carried on rosters prepared by Prudential under dates of May 1, 1958 and June 30, 1959. Prudential calculated the advance premium, to be paid by the policyholder on June 30, 1958, on the basis of the continued employment of Elmhorst. This premium was paid. Upon receipt of information contained on a Notice of Group Insurance Changes form dated June 24, 1959, but evidently not tabulated until after the June 30, 1959 roster was prepared, a line was drawn through Elmhorst's name on the roster and the policyholder was credited with eight monthly premiums in his case, or back to the date of death. Had Elmhorst still been alive, only one monthly premium would have been refunded. According to the testimony of a Prudential field representative: "This is an administrative convenience to the Prudential. * * * [T]he divided calculation would take up much of the importance * * * of premiums that might be kept by the Prudential temporarily."

No contention is made in this court that Elmhorst's insurance terminated under the provision for automatic termination "if he [employee] fails to make, when due, any required contribution." Prudential contends that upon Elmhorst's retirement, the circumstances of which are hereinafter set forth, he then and there ceased to be covered. The court below so held. That would mean that he was not insured at the time of his death. Plaintiff's appeal is based on the contention that the policyholder's failure to notify Prudential of Elmhorst's retirement until June 24, 1959 left the insurance in effect at the date of death, October 25, 1958. It was shown that it was Gaspro's

established policy not to cover retired employees, and that this established policy was known to Prudential, but on plaintiff's theory that is not enough to sustain the judgment.

In January, 1958, Gaspro's Assistant Personnel Director called on Elmhorst at his home to "explain what he would receive under disability retirement." Gaspro had a retirement plan, also carried by Prudential. The amount Elmhorst would receive on disability retirement was explained to him. It further was explained to him "that in the event he did take disability retirement, his Prudential group life insurance policy would expire in thirty-one days, under the terms of the thing, and that * * * it would be up to him to apply for a conversion, that would be to a private policy outside of the group, within the thirty-one days."

A public relations consultant went along on this occasion at the request of Gaspro officers, because of their concern "that everything be done for him [Elmhorst], everything that could be done, under our policy." (Tr. 183). According to this consultant: "Mr. Elmhorst was told that he had thirty-one days after his termination of service upon which time he could, without physical examination, get another type of Prudential policy."

At this meeting no decision was made. However, on January 28, 1958 Elmhorst signed a "Notice of Retirement Status" under the Prudential Group annuity contract, not the policy in question, with retirement to take effect on March 3, 1958, designated as the "Optional Early Annuity Date." On that date he would be 62 years of age. Previously a Gaspro officer had endorsed the notice under the printed statement "The above information is approved." The notice was forwarded to Prudential in February, 1958. It provided for the first monthly annuity payment to be made April 1, 1958. At a meeting in March,

1958, Gaspro's directors voted a supplementary pension for Elmhorst, payable from Gaspro's funds. This supplementary pension had been discussed with Elmhorst at the meeting at his home, along with the social security benefits for which he was eligible on disability retirement and his benefits under the group annuity contract.

When Elmhorst's right to sick pay expired on December 6, 1957 he was still disabled. Thereafter he retired, and we do not deem it material whether he retired January 28, 1958, when he made the decision manifested by his signing the "Notice of Retirement Status," or March 3, 1958, pursuant to the statement in the notice that "Retirement will take effect on March 3, 1958." The exact date of retirement would be material only if Elmhorst previously, within the meaning of the policy, was "granted a leave of absence." We do not understand that the leave of absence provision applied at any time. Elmhorst was a disabled employee whose sick pay had run out and whose future status had not been determined at the time of the meeting at his home. The disability provisions of the policy covered absence from work for this particular reason, to be distinguished from leave of absence in general covered by other provisions. *Cf., Kelly* v. *Montour R.R.*, 195 Pa. Super. 587, 171 A.2d 632; *Terry* v. *United States*, 120 Ct. Cl. 315, 97 F. Supp. 804, *modified on another point*, 101 F. Supp. 165. Up to Elmhorst's retirement no action was taken to change his status from that of a disabled employee. *Cf., Hawthorne* v. *Metropolitan Life Ins. Co.*, 285 Mich. 329, 280 N.W. 777; *MacDonald* v. *Pennsylvania Mut. Life Ins. Co.*, 122 Pa. Super. 288, 186 Atl. 234.

However, if it be supposed that Elmhorst had, within the meaning of the policy, been "granted a leave of absence" for a period commencing December 7, 1957, after his sick pay expired, then under the provisions of the policy termination of insurance, except for the conversion

period, occurred at the end of the policy month succeeding that in which the leave of absence commenced, *i.e.,* the policy month ending in January, 1958, unless Elmhorst in the meantime had retired and was covered as a retired employee. On this hypothesis the date of his retirement would be material, but in any event would be January 28, 1958 before the end of the policy month and consequent automatic termination of insurance. The words "retirement" and "retired" are used in the policy. Likewise, the statute, R.L.H. 1955, § 181-562, uses the words "retired employees" in providing that the policy "may provide that the term employees shall include retired employees." We do not deem it essential that a person be currently receiving a retirement benefit in order to be "retired" within the meaning of the policy and the cited statute. *Cf., Watson* v. *Brower,* 24 N.J. 210, 215, 131 A.2d 512, 515.

The "Notice of Retirement Status," since it had to do only with the annuity plan, did not serve as notice of termination of the insurance of the retired employee under the group policy. *Passkowski* v. *Prudential Ins. Co. of America,* 182 F. Supp. 819, 821. Indeed, Prudential did not regard it as notice under the group insurance policy and continued to carry Elmhorst on the Group Insurance Roster. However, it is argued, and was held by the court below, that notice under the group insurance policy was not necessary since the absence of notice was a mistake, constituting a departure from the established policy of Gaspro not to cover retired employees, which policy was known to Prudential.

It appears that, due to confusion caused by the conversion of records to punch card accounting, Gaspro did not send in any of the forms called "Notice of Group Insurance Changes" in 1957, 1958, and the first part of 1959. The form sent in under date of June 24, 1959 carried terminations dating back as far as February 28, 1957,

sixteen in all, including that of one other employee who had retired after Elmhorst, on May 5, 1959.

On the June 24, 1959 form Elmhorst's date of termination was stated as December 6, 1957. This was his last day of sick pay. There is no contention that his insurance in fact terminated at that time. Prudential's contention is that he retired as of March 3, 1958, and that his insurance terminated on his retirement.

By the plain words of the policy, an employee who is retired is considered as not having terminated his employment, with the consequence that his insurance is not automatically terminated and he is insured at the amount for which he was insured on his last day of active work, unless (1) the policyholder terminates his insurance by notifying the insurance company to that effect,[3] and (2) in so doing, the employer acts on a basis precluding individual selection, which in turn requires (3) the policyholder must have an established basis so as to preclude individual selection. Only the third of these requirements was met in this case.

A mistaken failure to act on the intended basis is not the equivalent of notice to the insurance company. Otherwise the requirement of notice is eliminated entirely, and a provision that notice will be deemed to have been given if it ought to have been given is substituted. Such reasoning changes the whole character of the policy—coverage becomes entirely a factual question as to the status of the employee at the time of his death in relation to the adopted scheme or basis for the particular category. The status of an employee, *e.g.*, whether he was disabled, on leave of absence, or retired, may present a difficult question. It is a salutary provision of the policy that it requires an ab-

---

[3] The policy also provides for termination of a retired employee's insurance by the policyholder by discontinuance of premium payments for his insurance, but that is not involved.

solute cutoff by notice, unless all relationship between the employer policyholder and the employee has been severed by a discharge or resignation without the possibility of future work or retirement status, and subject also to certain limits on coverage during a leave of absence or temporary layoff.

Under our reading of the policy a retired employee is absolutely protected if the notice of termination has not been given. However, if notice of termination has been given the employee still may contest the right to give it. For example, if a notice was sent in that an employee had retired when in fact he was still on leave of absence, he could invalidate the notice provided his status on leave of absence entitled him to coverage. Or if the employer were to adopt a basis of covering retired employees until they actually started drawing their pensions but in a particular case the notice was sent in terminating the insurance at the time the employee ceased work, the notice of termination could be invalidated on that ground. Thus all the provisions of the policy are accorded significance and effect by our interpretation.

Prudential argues: "[I]f the termination of insurance coverage on retirement must be on a basis precluding individual selection, the continuation of such insurance must likewise be on a basis precluding individual selection." That does not follow. Continuation may be by inadvertence. Instances of such inadvertent continuation of insurance do not mitigate against the existence of an established uniform plan pursuant to which insurance may be terminated by notice.

Two cases have been cited involving policies requiring notice to the insurance company in order to terminate the insurance of an employee in case he is retired, *i.e.,* *Passkowski* v. *Prudential Ins. Co. of America, supra,* 182

F. Supp. 819, 821,[4] and *Schroeder* v. *John Hancock Mut. Ins. Co.,* 210 F. Supp. 756, 759, 227 F. Supp. 622. In each of these instances, it was recognized that under the terms of the policy the affirmative act of notice to the insurance company was required to carry out an election by the employer against continuance of the insurance. In *Rothermel* v. *Aetna Life Ins. Co.,* 275 Mich. 425, 266 N.W. 404, the certificate of insurance issued to the employee provided that his insurance would cease upon termination of the employment, but the master policy, after providing that the insurance of any employee should automatically cease at the end of the policy month in which employment terminated, further provided as an exception thereto that "if any employee is * * * temporarily laid off * * * his insurance shall continue until the company receives written notice from the employer that such insurance shall terminate." It was contended that the provisions of the group policy only concerned the employer and the insurance company. It was held, however, that since the certificate stated it was issued under and subject to the terms and conditions of the master policy:[5] "The provisions in the master policy are part of the contract of insurance, and plaintiff may invoke them." Accordingly, notwithstanding the employee was temporarily laid off at the time of his death he was held to have been covered by reason of a delay in sending notice of his layoff to the insurance company. We find these cases decisive.

It is argued that recovery on the policy would be a windfall, that Elmhorst was informed that his insurance

---

[4] Prudential relies on portions of the opinion in *Passkowski* having to do with the amount of insurance, under provisions of the policy not contained in the policy here involved. The pertinent portion of the opinion in *Passkowski* is the ruling: "As the notice of termination by the employer to the defendant herein specified had not been given, the deceased remained insured following retirement." (182 F. Supp. at 821.)

[5] The certificate in the present case is similar.

was about to terminate and that he had only a limited period for conversion to an individual policy, and that the evidence shows that Elmhorst deemed the cost of an individual policy too high and had decided against it. The latter point is disputed, but in any event is immaterial.[6] We agree that Elmhorst was not misled and that recovery on the policy is a windfall, but we must judge the case by the terms of the contract. Under those terms the employee's knowledge and understanding of his situation upon retirement were not enough to terminate his insurance. As we have said, no contention is made that Elmhorst's insurance terminated by reason of his not having continued his contributions. And since positive notice was required to terminate his insurance, such cases as *Equitable Life Assurance Society* v. *McDaniel*, 223 Ky. 505, 3 S.W.2d 1093, are inapplicable.[7]

Plaintiff having moved for a directed verdict and for judgment notwithstanding the verdict, and this court being of the opinion that the delay in notifying Prudential of Elmhorst's retirement is decisive in favor of plaintiff and that there is no issue of fact for the jury, the judgment is reversed and the case remanded for entry of judgment for plaintiff.

*Kenneth E. Young* (*Louis Le Baron* with him on the brief) for plaintiff-appellant.

*Richard E. Stifel* (*Anderson, Wrenn & Jenks* of counsel) for defendant-appellee.

---

[6] If notice to Prudential could be dispensed with it would mean that the conversion period had expired before Elmhorst's death even if extended under R.L.H. 1955, § 181-581, as renumbered by S.L. 1957, c. 310.

[7] In the cited case the insurance automatically terminated in the absence of affirmative action to continue it. It was held that, under the evidence, there was a question for the jury whether the continued payment of premiums by the employer was with the intention of keeping the insurance in force or was purely through mistake.

DISSENTING OPINION OF WIRTZ, J., WITH
WHOM TSUKIYAMA, C. J., JOINS.

I must respectfully register my dissent. The cases relied on by the majority are factually distinguishable and are neither persuasive nor compelling. The purpose and functions of the "Notice of Group Insurance Changes" was to govern the contractual relationship between the principal parties to the contract, the employer and the carrier. The contract of insurance was entered into by the employer with the carrier for the benefit of the employee. The inclusion in, or exclusion from, the insurance provided by the policy or the coverage of the particular employee was a matter of subsidiary agreement between the employee and employer. Here, the employee never was given to understand that he was to continue to be covered by the policy of insurance upon retirement. To the contrary, he knew he was not covered. Not only had he been told so but he ceased to make his contributions to the premium through the employer.

Under the insurance policy the company had the sole right to determine whether to provide the group insurance for its retired employees as a class and in the exercise of that right it determined that retired employees should not be covered. Having so determined, the company could not under the terms of the policy have provided the employee alone (without including all retired employees as a class) with insurance coverage after his retirement and, consequently, the company's failure to notify the carrier of the termination of the employee's insurance did not create any rights in favor of the employee or appellant.

DISSENTING OPINION OF TSUKIYAMA, C. J.

Upon the record of this case, I am impelled to join in the dissenting opinion of Mr. Justice Wirtz. While I am in agreement with the views and conclusion reached by him, I deem it appropriate to give further emphasis to

certain salient aspects of the case.

It is not disputed that Elmhorst was, after the expiration of his sick leave, advised by representatives of Gaspro, the employer and policyholder, that upon his disability retirement, the Prudential group life insurance policy would expire and that he should consider the matter of a conversion to an individual type of policy, which could be done in thirty-one days after termination of service. Though there appears to be some dispute as to whether Elmhorst positively declined to accede to the suggestion, his failure to convert was a decisive answer. In any event, that phase is immaterial. A "Notice of Retirement Status," dated January 22, 1958, was forwarded by Gaspro to Prudential showing Elmhorst's retirement, effective March 3, 1958. Noteworthy is the fact that Elmhorst personally signed the notice on January 28, 1958. True, the notice was given under the Prudential group annuity contract and not under the Prudential group life insurance policy, but it sufficed as a personal acknowledgment by Elmhorst that he was retired.

Moreover, Elmhorst knew that he no longer contributed any premium to the group insurance, his final payment having been deducted from the payroll on December 6, 1957, up to which time he was receiving his sick pay. His death occurred on October 25, 1958.

As shown by the evidence, it was the established practice between Prudential and Gaspro for the latter as policyholder to pay the premiums at the beginning of the policy year, subject to adjustment by the former at the end of the year based upon information received from the latter. Refunds, additional contributions, or other corrections would be made as disclosed by the calculation.

It is further shown by the uncontradicted evidence that Gaspro had adopted a policy not to cover retired employees as a class in group insurance; that such policy was

known to Prudential and Elmhorst; that, through a clerical oversight, Gaspro did not give Prudential notice of the termination of Elmhorst's insurance; and that Elmhorst had no knowledge of such mistake. The existence of Gaspro's policy on retired employees and of the adjustment procedure aforesaid precluded Elmhorst, who knew that he was actually retired and no longer paying any premium, or his beneficiary, from claiming any right to coverage under the group insurance on the ground that Gaspro had failed to notify Prudential of the retirement.

The cases cited are distinguishable in that in the instant case at least "Notice of Retirement Status," signed by Elmhorst, was given by Gaspro to Prudential. Though the "Notice of Group Insurance Changes" was the form used for group insurance purposes, as distinguished from the form used in annuity contracts, in either case the parties involved were the same, *i.e.*, Prudential, Gaspro and Elmhorst.

It is my view that the provision in the group insurance policy in respect to the giving of notice of termination could not be fairly and reasonably construed, under the circumstances of this case, as creating in Elmhorst any right, through a mistake in the matter of notification, to recover on the policy, thus giving him a windfall and unjust enrichment. *Equitable Life Assurance Society* v. *McDaniel*, 223 Ky. 505, 3 S.W.2d 1093.